IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

LACHÉ WILLIAMS,                     )
                                    )
            Plaintiff,              )
                                    )
        v.                          )        1:19-cv-106 (LMB/MSN)
                                    )
QUALITY TECHNOLOGY, INC., d/b/a     )
QUTECH,                             )
                                    )
            Defendant.              )

MEMORANDUM OPINION

In this civil action brought under the Americans with Disabilities Act ("the ADA"), the

Court entered judgment after a bench trial in favor of defendant Quality Technology, Inc.

("QuTech" or "defendant"). Plaintiff Laché Williams' ("Williams" or "plaintiff") has filed a

Motion for Further Action After a Non-Jury Trial [Dkt. No. 89], in which she asks the Court to

amend its findings of fact, make new conclusions of law, and enter a new judgment under

Federal Rule of Civil Procedure 59(a)(2).[1]

As discussed below, this motion will be denied for several reasons. First, Rule 59(a)(2)

authorizes courts to amend their findings of fact and conclusions of law or enter a new judgment

only upon a motion for a new trial, but plaintiff has not specifically moved for a new trial.

Second, even if the Court did have the authority to grant the requested relief absent a motion for

a new trial, Williams' motion would fail on the merits because it does not demonstrate that the

---

[1] Although plaintiff's motion does not state the subsection of Rule 59(a) under which she is
seeking relief, the accompanying memorandum indicates that she is proceeding under Rule
59(a)(2). See [Dkt. No. 90] at 2.

judgment was against the clear weight of the evidence, was based on evidence which is false or on a manifest error of law or mistake of fact, or will result in a miscarriage of justice.

## I.  Background

This civil action's lengthy procedural history, which led to the bench trial, will first be discussed.

### A.  The parties and the complaint

QuTech is an information technology company that works on government contracts. In April 2014,[2] Williams was hired by QuTech's Falls Church, Virginia office to work as an analyst on QuTech's contract with the Centers for Medicare and Medicaid Services ("the CMS contract"), under which QuTech provided support services relating to the Affordable Care Act ("ACA"). In early September 2015, Williams and other employees were told that they might need to assist with telephone inquiries due to the influx of calls during the ACA open enrollment period, a task that Williams alleges she was not previously required to perform. In her complaint, Williams claimed to have an anxiety disorder, the symptoms of which can be "brought on in the workplace by speaking on the phone." Compl. [Dkt. No. 1] ¶ 15. She informed QuTech of her disorder and stated that she wanted to request an accommodation. After interactions with QuTech managers and employees during which Williams alleges she behaved appropriately, but during which QuTech claims she was insubordinate and unprofessional, QuTech terminated her on September 21, 2015. On January 28, 2019, after exhausting her administrative remedies, Williams filed this action alleging that QuTech discriminated against her based on her anxiety disorder in violation of the ADA (Count I), failed to accommodate her disability (Count II); and

---

[2] Williams had previously worked at QuTech as a temporary representative. Trial Tr. at 11:25-12:1.

retaliated against her (Count III). Williams' complaint sought "[l]ost wages in excess of $75,000 . . . or in an amount to be proven at trial," $200,000 in compensatory damages, $200,000 in punitive damages, attorneys' fees and costs, pre- and post-judgment interest, and any other relief the Court deemed just and proper. Id. at 8.

## B. Summary judgment

In September 2019, the parties filed cross motions for summary judgment. QuTech's motion contended that Williams was terminated not because of her disability or request for an accommodation, but rather because of her insubordination, and further argued that summary judgment should be granted in its favor on Counts I and II because Williams was not disabled under the ADA.

The ADA defines disability, in relevant part, as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual."[3] 42 U.S.C.A. § 12102(1)(A). Williams contended that her anxiety "substantially limits her ability to perform a major life activity because it can cause her to freeze-up making her unable to speak resulting in the inability to communicate and work." [Dkt. No. 42] at 11. The Court granted QuTech's motion for summary judgment on Counts I and II, in part because even viewing the evidence in the light most favorable to Williams, and construing "substantially limits" broadly in favor of expansive coverage, there was insufficient evidence in the summary judgment record from which a reasonable fact finder could conclude that plaintiff suffered from an anxiety disorder which substantially limited one of the referenced major life activities. Among the significant defects in

---

[3] A plaintiff may also allege that she is disabled under the ADA because she has a "record of such an impairment" or is "regarded as having such an impairment," see 42 U.S.C. § 12102(1)(B) and (C). Williams did not allege that she was disabled under these prongs of the statute.

plaintiff's evidence was that the medical records submitted to the court did not support, and even undermined, her own assertions about her limitations. For example, although Williams apparently saw a psychologist, Dr. Spencer Johnson, almost a month after her termination, that doctor's records did not confirm that her anxiety disorder limited her in the specific manner she described. [Dkt. No. 42-3]. The next most recent medical records submitted were from 2009, about six years before her termination, and they did not reflect her specific alleged limitations either. None of Williams' medical records indicated, for example, that her anxiety "can cause her to freeze-up making her unable to speak resulting in the inability to communicate and work." Moreover, although Williams alleged that a traumatic event in 2001 triggered her anxiety about speaking on the phone, [Dkt. No. 45-1] at 134:17-22, her medical records reflected that in 2007, while in another job, Williams sent a message to a medical provider in which she described answering phones as not being stressful. See [Dkt. No. 45-3] at 6 ("I work at the Call Center . . . and I do not do anything stressful at work other than sit at my desk and answer the phone.").

With respect to Williams' failure to accommodate claim, the summary judgment record showed that QuTech had made reasonable efforts to work with Williams to find an accommodation for her, but Williams had failed to participate in the interactive process in good faith. Ruddell v. Triple Canopy, Inc., No. 1:15-cv-1331, 2016 WL 4529951, at *9 (E.D. Va. Aug. 29, 2016) ("[P]laintiff, no less than defendant, has an obligation to engage in the interactive process in good faith."). For example, because the accommodation process "must be truly 'interactive,' an employer is not required to continue the process when the employee cannot identify a reasonable accommodation that would have been possible." Ruddell, 2016 WL 4529951, at *9 (quoting Wilson v. Dollar Gen. Corp., 717 F.3d 337, 347 (4th Cir. 2013)). Although Williams, who had been hired under a job description stating "[c]all center experience

strongly preferred," [Dkt. No. 45-6], stated in an email to her supervisor that she was unable to assist on the phones, [Dkt. No. 45-11] at 2, the record did not reflect that providing a phone-related accommodation would have been a reasonable accommodation responsive to her alleged impairment. While the complaint stated that Williams' anxiety could be triggered by "speaking on the phone," Compl. ¶ 15, Williams' own deposition testimony suggested that her anxiety could be triggered not simply by having to speak on the phone but by being in a "noisy environment." [Dkt. No. 54-1] at 91:8-11 (testifying that she uses a cell phone on vibrate and that her trigger is "[n]ot a telephone. It's the noisy environment"). Although plaintiff did not submit an affidavit from a medical expert at summary judgment, QuTech submitted both an affidavit and excerpts from the deposition of its expert, Dr. Jeffrey S. Janofsky, who testified that "one would expect, based on my training and experience as a psychiatrist who has reviewed probably hundreds of thousands of pages in records and . . . seen thousands of patients in my career . . . [that there would] be some mention of this [phone-related] issue in prior treatment records, specifically, for the treatment of anxiety if it had occurred as she said. There is none." [Dkt. No. 57-2] at 5-6; see also [Dkt. No. 45-4]. Accordingly, even if Williams had been excused from answering calls altogether, there was insufficient evidence that that accommodation would have alleviated any limitations associated with her anxiety. See Hamel v. Bd. of Educ. of Harford Cty., No. 16-cv-2876, 2018 WL 1453335, at *12 (D. Md. Mar. 23, 2018) ("[A]t a minimum, Plaintiff must show that her requested accommodation is related to her . . . limitations—i.e., it is plausible that had the accommodation been granted it would have alleviated her . . . limitations and allowed her to perform an essential job function or enjoy 'equal benefits and privileges of employment' she otherwise could not.").

Accordingly, the Court granted summary judgment for the defendant on Counts I and II, but allowed the retaliation claim (Count III) alone to proceed to trial, because there were genuine disputed material facts as to that count, and ADA retaliation claims do not require a plaintiff to be disabled under the statute or to have engaged in the interactive accommodation process.

## C. Motion to strike

On October 9, 2019, QuTech moved to strike the complaint's request for compensatory and punitive damages and a jury trial, arguing that none of those remedies were available in a standalone ADA retaliation action. That motion was granted based on the reasoning in two unpublished Fourth Circuit opinions and authority from the Seventh and Ninth Circuits concluding that such relief is unavailable for ADA retaliation claimants. See Rhoads v. F.D.I.C., 94 F. App'x 187, 188 (4th Cir. 2004) ("[Plaintiff's] claim that she was entitled to recover compensatory and punitive damages in her trial for violation of the ADA's anti-retaliation provision fails because such relief is unavailable.") (citing Kramer v. Banc of Am. Sec., LLC, 355 F.3d 961, 965 (7th Cir. 2004), cert. denied 542 U.S. 932 (2004)); Bowles v. Carolina Cargo, Inc., 100 F. App'x 889, 890 (4th Cir. 2004) ("[Plaintiff's] sole issue is that he was entitled to a jury trial on his retaliation claim under [the ADA] . . . We find this claim to be without merit.") (citing Kramer, 355 F.3d at 964-66; Alvarado v. Cajun Operating Co., 588 F.3d 1261 (9th Cir. 2009). As the Seventh and Ninth Circuits observed in Kramer and Alvarado, in 1991 Congress enacted the Civil Rights Act of 1991, which permitted certain civil rights plaintiffs to recover compensatory and punitive damages. See 42 U.S.C. § 1981a(a)(2). This statute did not explicitly authorize these additional remedies across the board; instead, it only expressly provided these additional remedies to certain specifically delineated claims. The statute specifically authorized these remedies for ADA discrimination and failure to accommodate claims under 42 U.S.C.

§ 12112 and 42 U.S.C. § 12112(b)(5), but excluded any mention of ADA retaliation claims under 42 U.S.C. § 12203. Accordingly, as the Seventh Circuit stated in Kramer, "[b]ecause claims of retaliation under the ADA . . . are not listed, compensatory and punitive damages are not available for such claims." Id. at 965. Moreover, because an ADA retaliation claimant is "not entitled to recover compensatory and punitive damages, she has no statutory or constitutional right to a jury trial." Id. at 966. Based on the reasoning in Kramer, which the Fourth Circuit has twice cited favorably, and that in Alvarado, the Court granted the motion to strike.

This conclusion was consistent with the recent holdings of many district courts in the Fourth Circuit. See, e.g., Via v. Comm'n Corp. of Am., Inc., 311 F. Supp. 3d 812, 821-22 (W.D. Va. 2018); Harvey v. GoBo, Inc., No. 6:16-cv-76, 2017 WL 4973205, at *4 (W.D. Va. Nov. 1, 2017); Akbar-Hussain v. ACCA, Inc., No. 1:16-cv-1323, 2017 WL 176596, at *4-5 (E.D. Va. Jan. 17, 2017). In fact, a judge in the Western District of Virginia recently held that compensatory and punitive damages and a jury trial were unavailable as a matter of law for an ADA retaliation claim, and subsequently denied the plaintiff leave to pursue an interlocutory appeal, "[b]ecause there does not appear to be a substantial difference of opinion on this issue within the Fourth Circuit." Dalton v. Lewis-Gale Med. Ctr., LLC, No. 7:19-cv-204, 2019 WL 4394757, at *2 (W.D. Va. Sept. 13, 2019).

### D. Trial

Because no jury trial was available to Williams, a bench trial was held. To prevail at trial on an ADA retaliation claim, a plaintiff must proceed either by offering direct or circumstantial "evidence of retaliatory animus" or by successfully navigating the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 249 (4th Cir. 2015); Jacobs, 780 F.3d at 577-78. Under the burden-shifting

framework, a plaintiff is first required to establish a prima facie case by showing "(1) that [s]he engaged in protected activity; (2) that [her] employer took an adverse action against [her]; and (3) that a causal connection existed between the adverse activity and the protected action." Jacobs, 780 F.3d at 578 (internal quotation marks and citation omitted) (alterations in original). "The employer then has the burden to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." Id. (internal quotation marks and citations omitted). "The burden then shifts back to the plaintiff to show that the proffered reason is pretext." Id. "The plaintiff always bears the ultimate burden of persuading the trier of fact that she was the victim of retaliation." Id. (internal quotation marks and citations omitted).

Williams provided no direct evidence of retaliatory animus during trial, nor did she argue that the circumstantial evidence demonstrated such animus. Although she did not explicitly state that she was proceeding under the McDonnell Douglas burden shifting framework, her counsel focused his argument on the three components of a prima facie case under that framework. See Trial. Tr. at 85:9-13 ("She requested the accommodation on the 15th. She engaged in the protected activity. HR received it. They knew what -- they knew she was making a request under the act. She was terminated. There's the adverse employment. The issue here is causation."). Plaintiff's counsel also suggested that QuTech could not rebut the presumption of retaliation because "[t]he evidence presented today will not show a legitimate nondiscriminatory reason, and as such, the termination was retaliatory." Id. at 7:4-6. Accordingly, the Court applied the McDonnell Douglas framework at trial.

The bench trial consisted of the testimony of three witnesses: the plaintiff; Sandria Scott, a former QuTech Human Resources employee;[4] and Romane Crispin, a former QuTech Senior Operations Manager who oversaw some of the managers that worked with Williams and who ultimately made the decision to recommend terminating Williams.[5] Williams' counsel objected to the use of Crispin as a witness, alleging that he was not properly disclosed under the federal rules, because QuTech did not timely provide Crispin's accurate address as part of its initial and pretrial disclosures, interrogatory answers, and witness lists.[6] Trial Tr. at 57:22-58:9. QuTech's counsel responded that although defendant did not have Crispin's address when its initial witness list was submitted, it ultimately located and served Crispin at the proper address "45 days or so ago," and a corresponding affidavit of service was filed with the court, which gave plaintiff's counsel notice of the address. Id. at 58:12-20. Plaintiff's objection was overruled after QuTech's counsel explained that Crispin had stopped working for QuTech "about a year and a half ago," id. at 58:21-59:3, which was a reasonable explanation for QuTech not being able initially to

---

[4] Because Scott was unavailable for trial, the Court allowed the parties to take her testimony before the trial. Although described as a de bene esse deposition, the witness actually appeared in court and before the undersigned judge, to ensure that the examination occurred exactly as it would have if Scott had testified during the trial.

[5] At the conclusion of Williams' case in chief, QuTech moved under Rule 52(c) for a judgment on partial findings. Drawing all inferences in favor of the plaintiff, the Court denied this motion and the trial proceeded. Trial Tr. at 57:2-10. The trial transcript may be found at Dkt. No. 87.

[6] Under Rule 26(a)(1)(A)(i), a party must provide as part of its initial disclosures "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment." Id. Under Rule 26(a)(3)(A)(i), a party must provide as part of its pretrial disclosures "the name and, if not previously provided, the address and telephone number of each witness—separately identifying those the party expects to present and those it may call if the need arises." Id. Parties are also obligated under Rule 26(e)(1)(A) to supplement or correct their disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing." Id.

provide an accurate address for him, id. at 59:3. The Court further held that "as long as the plaintiff had sufficient notice in advance, they could have made the contact if they needed to." Id. at 59:3-5. Crispin was allowed to testify, and Williams' counsel had a full opportunity to cross-examine him.

The evidence at trial demonstrated that each fall, the QuTech employees working on the CMS contract received an influx of calls and emails during the ACA open enrollment period. Trial Tr. at 61:21-62:13. On September 1, 2015, a QuTech manager informed Williams and other employees that they might need to assist with answering some of the incoming phone calls. Def.'s Ex. 19; Trial Tr. at 33:1-6. Williams initially testified that the manager did not tell the employees at this meeting that they would be disciplined for insubordination if they did not assist with phone calls, Trial Tr. at 33:7-16; however, after QuTech introduced into evidence a complaint Williams signed and filed with the Fairfax County Office of Human Rights & Equity Programs about this issue, in which she indicated that the manager "stated that any staff who refused to assist with the phones would be written up for insubordination and/or other disciplinary actions," Def.'s Ex. 19, Williams conceded that this "must be [true] if [she] signed it." Trial Tr. at 34:13-19.

Williams testified that she wanted an accommodation under which she would handle "[e]ither limited or no phone calls and just . . . continue to work on . . . e-mails." Id. at 15:20-21. On September 1, 2015, Williams emailed her supervisor, stating that she intended to provide documentation from a therapist "regarding [her] severe anxiety and inability to assist on the phones." Pl.'s Ex. 5. In that email, Williams wrote that she had repeatedly been told that her position would not involve answering phones, and that "[s]hould [she] be forced to take any calls, [she would] have to follow up with a formal complaint once again on the processes of the

Operations Management department." Id. The email concluded by stating: "[m]y apologies if this email is a bit on the stern side, but I'm tired of those in certain positions thinking they have certain powers to enforce things." Id.

Williams testified that her supervisor told her that same day to contact Human Resources, Trial Tr. at 39:21-24; however, Williams did not immediately forward her email to any Human Resources employee. Although she testified that at some point during the first week of September, she emailed Human Resources employee Gevada Sims about this issue, id. at 43:8-10, no such email was introduced into evidence, and Sims was not called as a witness. Williams admitted that she never submitted the ADA paperwork that QuTech required from employees requesting an accommodation. Id. at 53:4-14. Williams explained that she did not file the required paperwork because she was waiting for documentation from her doctor, id. at 43:13-14, but she also admitted that she knew she could have submitted the employee portion of the ADA paperwork without awaiting the doctor's evaluation, id. at 43:15-17.[7]

Williams testified that she was not actually called upon to answer a phone until about September 15, when a manager told her that she needed to get on the phones. She admitted that she refused to comply and told the manager she "was working with HR on an accommodation and that [she would] be working e-mails and not answering calls that day." Id. at 40:25-41:2. She also told the manager that "should something happen while [she] was on the phone or if [she] got a phone call, then he would need to speak to HR and an attorney," and her doctor. Id. at 41:6-10. Williams testified that despite these statements, she was able to answer at least two calls. Id. at

_____

[7] Williams also admitted that she already had the proper ADA forms as of September 1, 2015, because she had made unrelated requests for accommodations from QuTech twice before, id. at 39:6-11, one of which QuTech granted, and one of which Williams abandoned because the problem had been addressed. Id. at 35:10-38:4.

11

41:23. For one of the calls, Williams testified that she needed help from her supervisor, who gave her a "pep talk" after she allegedly had a "panic attack." Id. at 17:11-13; 39:25-40:15. Williams testified that she answered a second call unassisted, id. at 17:11-13; 56:5-7, and that she did not have "any other issues with answering the phone calls," except that she had to transfer certain calls because she did not have access to the system for resetting a caller's password. Id. at 17:14-21. That same day, Williams forwarded Scott the email she had sent her direct supervisor on September 1. Pl.'s Ex. 5. Scott responded thanking Williams "for forwarding the e-mail regarding [her] impending accommodation," and set up a meeting with her for the following day. Id.

Scott testified that on September 16, 2015, she traveled from her office in Maryland to meet with Williams at QuTech's Falls Church office. Dep. Tr. at 11:22-12:8.[8] Williams testified that during that meeting, she did not suggest any particular accommodation[9] and "informed [Scott] [that she could] continue assisting on the phones," but "just didn't want to be held accountable should something happen, because [her] performance thus far had been in the 96 to 100 percentile." Trial Tr. at 45:5-10. In a letter to a doctor sent on September 18, 2015, Williams stated that the HR representative told her during this meeting "that the accommodation c[ould] be made for [her] to do other duties than phone support." Def.'s Ex. 21 at QT000277. Williams confirmed in her testimony that she was referring to Scott in this letter, but testified that Scott had said the accommodation could be made "once the paperwork was received." Trial Tr. at

---

[8] The transcript of Scott's testimony may be found at Dkt. No. 84-1, and will be cited here as Dep. Tr.

[9] Williams testified that she also discussed with Scott whether she could work remotely some days to attend her mother's chemotherapy appointments. Trial Tr. at 16:21-23.

47:25-48:5. Scott testified that she told Williams that she "should continue to try to do her work as requested" until the paperwork was received. Dep. Tr. at 22:16-19.

On September 17, 2015, Crispin spoke in person with Williams regarding her situation. Trial Tr. at 19:19-22; 55:13-17.[10] Crispin's and Williams' testimonies differed as to the substance of this conversation. Williams testified that she told Crispin she would continue to assist on the phones until her ADA paperwork was completed. Id. at 19:24-20:1. Crispin, by contrast, testified that Williams had refused to answer calls and then "told [him] her reason why she didn't want to get on the phone." Id. at 72:10-12. He also testified that Williams told him at some point "that Ms. Scott told her that she was excused from taking phone calls," id. at 63:24-25, even though that "contradicted what [Scott] said," id. at 76:3. Crispin testified that he attempted to arrange a call with Scott for that day, but Scott was unavailable. Id. at 64:10-14; 76:3-4. Williams testified that Crispin then told her "[w]e'll get it squared away for you," id. at 49:10, but Crispin testified that he said that "until [QuTech] could confirm, she would need to take phone calls," id. at 64:17-18.

Crispin testified that on September 18, 2015, Williams was again asked to answer phones, and in response she requested a meeting. Id. at 64:22-24. Williams ultimately had two meetings that day in Crispin's office. Id. at 17:22-18:2. A central factual dispute at trial was about what occurred during these two meetings. Scott participated in the first meeting by phone. Id. at 18:3-5; 64:25. Williams testified that Crispin had called Scott on his cell phone and placed it on speaker phone mode, id. at 18:5-6, while Crispin testified that he used the QuTech phone technology, id. at 81:18. Williams and Crispin agreed that during the meeting, Scott and Crispin

---

[10] Crispin had a difficult time recalling the precise date of this conversation. See Trial Tr. at 73:2-5.

discussed Williams' situation, and Scott reiterated that Williams would need to continue to assist on phones until she provided ADA paperwork. Id. at 18:6-10, 64:25-65:4. Crispin testified that during the meeting, Williams "was very defiant" and "insubordinate," and "abruptly left the meeting while Ms. Scott was explaining the company's position." Id. at 65:7-9. Crispin further testified that "[a]s [Williams] was leaving, [he] told her, 'Hey, the meeting is not over. Let's, you know, come back and let's finish discussing it." Id. at 65:9-11. According to Crispin, Williams replied, "you can't have me working under a ten-year-old job description," "refused" to stay, and "exited [his] office and slammed the door." Id. at 65:12-15. Crispin testified that when Williams slammed the door, it caused other employees to "stop[] working," and "put customers on hold to chat about what just happened," id. at 81:5-9. Scott testified that she did not recall whether Williams spoke during the meeting or what the tone of the conversation was, but she recalled Crispin telling her that Williams had left the room in the middle of the discussion. Dep. Tr. at 16:9-20; 18:18-19:10; 1920-20:6. Crispin testified that Williams subsequently "went back to her work station . . . logged off, took her belongings, and left" the premises. Trial Tr. at 66:3-6.

Williams admitted that she left the meeting, but in contrast to how Crispin described her conduct, she claimed that he approved her leaving. Specifically, she contended that Scott "began talking to [Crispin], but [Williams] wasn't sure exactly what [Scott] was saying because the speaker phone was going in and out, so while [Scott] was talking to him, [Williams] pulled [her] cell phone out and pointed to it to say: Can I make a call?" Id. at 18:12-15.[11] Williams claimed

---

[11] In the complaint Williams filed with the Fairfax County Office of Human Rights & Equity Programs, which was introduced as defendant's Exhibit 19, she did not state that she asked to leave by pointing to her cell phone; instead, she reported that she said, "Hold on. I'll be right back." Def.'s Ex. 19.

that Crispin made a motion suggesting that he approved of her leaving. Id. at 18:16-25.[12]
Williams testified that she left the door cracked open, and then went to her car in the garage to
call her doctor and check on the status of her paperwork. Id. at 18:17-22. She testified that she
went to her car because the cleaning crew were in the hallway, "so [she] didn't want to go out
there and make the call." Id. at 18:19-21. She also testified that she took her jacket with her
because she "didn't need it because the air [conditioning] wasn't on that day," id. at 50:11-12,
and took her book bag because it had music equipment in it, id. at 50:9-10, but left behind her
lunch box and books, id. at 50:14.

It was undisputed that at some point Williams came back and met with Crispin again. Id.
at 20:4-10, 66:7-12. Crispin testified that he asked Williams why she had left, and she reported
that she needed to call her doctor or attorney. Id. at 66:13-14. For this meeting, Crispin called a
different Human Resources employee, Sims. Id. at 18:1-2; 66:15-16. Williams testified that Sims
"reiterated" that Williams would "continue to assist on the phones until they received the
paperwork so that they could review it," and "said something about additional training." Id. at
20:17-23. Crispin testified that Williams displayed the same insubordinate and unprofessional
behavior during this meeting, and "abruptly got up while Ms. Sims was talking and again exited
the office and slammed the door." Id. at 66:15-24. According to Crispin, this "created a scene on
the floor" and "disrupted the work environment." Id. at 66:23-24. Crispin testified that if
Williams had "allowed [Crispin and the human resources staff] to continue [their] conversation
with her, [he] would have probably tried to make some accommodation for her," but he "never

---

[12] Crispin denied that Williams made any request seeking permission to leave or that he made a
gesture approving of her leaving. Id. at 65:16-25.

had an opportunity to share that with her because she was just unreasonable that day." Id. at 82:4-14.

Williams again provided a conflicting account about how this meeting ended. She contended that because the phone call with Sims was "distorted and cutting out in pieces," she decided to leave the office, but only after she told Sims "[t]he call is going in and out," and that she would "e-mail [Sims] when [she got] back to [her] desk." Id. at 20:24-21:1. She asserted that Crispin then opened his office door for her and "signaled for [her] to go ahead on back to [her] desk," after which she completed the rest of her work shift. Id. at 21:2-4.

Crispin testified that he made the decision to recommend terminating Williams after these meetings, id. at 66:25-67:4, based on "her insubordination, her misconduct, her disrupting the work flow for that day, and, you know, we had supervisors in management basically who felt intimidated by her, too." Id. at 69:7-9. He also testified that there had been other incidents where Williams had "displayed unprofessional misconduct," though he could not recall the specific time frame of such incidents. Id. at 76:20-23. In support of the decision, Crispin drafted a Performance Counseling Form describing the reasons for Williams' termination, which included a discussion of the September 2015 incidents. Def.'s Ex. 15, Trial Tr. at 67:22-70:2. The Performance Counseling Form stated, in part, that Williams "repeatedly exhibited unprofessional and insubordinate behavior towards management," "refused work," was "aggressive in her negative responses when she disagree[d] with a request from department supervisors/managers," and violated "policy 1.15.6 Disciplinary Procedures in the Employee Manual that [she] received and signed for on 4/21/2014." Def.'s Ex. 15. QuTech terminated Williams on September 21, 2015. Trial Tr. at 13:17-18. As of the date of her termination, Williams still had not provided any ADA paperwork to QuTech relating to her anxiety disorder. Id. at 52:23-53:14.

As part of his cross-examination of Crispin, plaintiff's counsel moved into evidence Exhibit 12, an email chain between Crispin and others discussing the reasons for terminating Williams. Id. at 80:4-14. Plaintiff's counsel asked Crispin about portions of this exhibit, but chose not to address all of the emails in it. Among the portions that plaintiff's counsel did not address was the following email from Crispin: "Gevada/Jim—Please find attached the revised Performance Counseling Form to include Bob's edits. Bob—Christian Cartagena, former Ops. Manager, prepared two corrective action documents on LaChe back in March of 2015, due to the same behavior. Additionally, I had verbally counseled LaChe, in my office with Larry Harris and Barbara White, earlier in the year as well, for inappropriate language in comments she made about QuTech on the floor." Pl.'s Ex. 12. The email thread also included a message from an individual named Robert Cabell stating, "I thought [Williams] had been written up before," id., a statement that plaintiff's counsel also chose not to address during the trial.

During her testimony, Williams attempted to identify a comparator who was treated more favorably. Specifically, Williams discussed another employee named John Coles, who she testified had also refused to answer phones and "yelled . . . very loud" "[t]hat he's not getting on any F-ing phones." Trial. Tr. at 28:6-29:1. Williams testified that QuTech also terminated Coles, but later rehired him. Id. at 29:2-7. Crispin acknowledged that Coles was rehired but explained that he was not rehired on the ACA contract, id. at 71:10-11, and that he would have objected to Coles being rehired on the ACA contract because "it would set a bad precedent if he was reinstated considering how he was terminated, and [Crispin] would not want to manage him if he did come back on the contract." Id. at 71:16-18. Crispin also speculated that Coles was rehired to work on another contract because he "was dating someone" related to QuTech's CEO. Id. at 71:19-22.

At the conclusion of the trial, the Court ruled from the bench in favor of defendant, primarily on the basis of the credibility of the witnesses, id. at 92:15-16, explaining that because Scott

> was not physically present at the [September 18] meeting, her ability to observe the demeanor, I think, of the plaintiff would have been significantly impaired, and she did not recall any of the additional information provided by Mr. Crispin, but I felt that his testimony was credible, the description of the plaintiff's behavior is consistent apparently with other problems with her performance in the past documented in Plaintiff's Exhibit 12, and I find that the simple fact that the termination decision was made six days after this first official communication with Mr. Crispin as to the plaintiff's requesting an accommodation, that the temporal relationship, while it's enough to establish a prima facie case, is not sufficient to overcome the evidence that's been presented by the defendant, and that is, that the plaintiff's conduct was of an insubordinate and rude nature, sufficient to justify an employer to terminate someone.

Id. at 92:18-93:8. The Court further concluded that the evidence surrounding Coles did not save plaintiff's case, because there was nothing in the record about the "conditions under which he was rehired," nor was there evidence that Williams "requested to be rehired by QuTech in a different capacity." Id. at 93:9-17. Accordingly, the Court entered judgment for defendant. Id. at 93:17-19.

### E. Rule 59(a)(2) motion

Plaintiff's counsel filed the instant motion on November 26, 2019.[13] In that motion, plaintiff asks the Court to revisit its judgment for three main reasons. First, she argues that under Rule 37, defendant should not have been allowed to call Crispin to testify due to its failure to disclose Crispin's address as required under Rule 26. Rule 37(c)(1) provides, in part:

---

[13] On the same day the motion was filed, Williams, acting pro se and apparently without her counsel's knowledge, filed a seven-page letter and 12-page set of exhibits alleging that QuTech falsified information provided during this litigation. The next day, Williams' counsel filed a motion on her behalf to withdraw and strike these documents. Because filed documents are part of the permanent record of the litigation, the Court denied the motion, but stated that it would not consider the filed documents as a formal motion for any kind of relief, and neither defendant's letter nor the attachments have been considered.

> *Failure to Disclose or Supplement.* If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

The motion suggests that the Court was operating based on a false statement when it overruled Williams' counsel's objection to Crispin, because QuTech's counsel had represented that Crispin's correct address had been disclosed "45 days or so ago," when in fact it was only disclosed 21 days before trial, when QuTech filed proof of service of a subpoena served on Crispin, and that allowing Crispin to testify "resulted in a miscarriage of justice." [Dkt. No. 90] at 5.

Second, the motion argues that the judgment was based on an error of fact regarding instances of Williams' prior misconduct that did not actually happen. Specifically, plaintiff argues that the Court should have ignored Exhibit 12's discussion of Williams' prior misconduct because there was evidence presented at the summary judgment proceeding that cast doubt on the accuracy of some of the allegations of prior misconduct. Among the summary judgment documents, QuTech filed an affidavit from its owner, Renee Parker, stating that no disciplinary action was taken against Williams based on the alleged incidents of misconduct in March 2015, because those incidents could not be substantiated. [Dkt. No. 45-2] ¶ 7. This affidavit was not before the Court at trial, as neither side introduced Parker's statements into evidence, nor was Parker called as a witness. [14] The motion further suggests that because the March 2015 incidents

---

[14] The motion further states that "[d]uring discovery, Renee Parker testified in QuTech's 30(b)(6) deposition that the March 2015 incident was a basis for terminating Ms. Williams. During her testimony, Ms. Parker failed to mention that the incident was never substantiated, that no corrective action was taken, or that the Performance Counseling Form for March 2015 was nothing but a draft allegation. The first time QuTech disclosed this information regarding the March 2015 incident was in Ms. Parker's affidavit filed with the Motion for Summary Judgment after the close of discovery." [Dkt. No. 90] at 6 n.3. The motion does not attach an excerpt of this portion of Parker's deposition, and this deposition testimony was not before the Court at trial. As

were never corroborated, and the only references to prior misconduct in the Performance Counseling Form were "general" and "unsupported," the Court should have been skeptical of the other assertions about Williams' misconduct in Exhibit 12. [Dkt. No. 90] at 6.

Third, Williams' motion argues that the Court erred in affording greater weight to Crispin's testimony than Scott's, because "Crispin provided erroneous testimony regarding Ms. Scott's ability to hear the conversation" during the September 18 meeting. [Dkt. No. 90] at 7. At trial, plaintiff's counsel insinuated that Williams could not have slammed the door after leaving the first September 18 meeting because Crispin "had to tell [] Scott that [Williams] . . . left and she slammed the door," implying if Williams had actually slammed the door, Scott would have heard it through the phone. Trial Tr. at 81:16-17. When plaintiff's counsel asked Crispin about this, Crispin testified that "[s]o our technology, when [] Scott is talking, you can't - - she can't – until she pauses, she won't be able to hear anything that's happening on our end." Id. at 81:18-20. The motion argues that this testimony was necessarily erroneous because "Williams testified that the phone call took place on [] Crispin's cell phone," and therefore Crispin "could not have been referencing the technology of QuTech's phone in [his] office." [Dkt. No. 90] at 7. The motion further asserts that "there was no evidence of what phone [] Scott was using or that [] Crispin had any knowledge of the type of phone QuTech had in [] Scott's office which was in a different location." Id. QuTech has filed an opposition to this motion, [Dkt. No. 96], and plaintiff has not filed a reply.

---

defendant states in opposition, "[i]t is unclear why [plaintiff's] [m]otion cites to deposition testimony confirming the contents of Plaintiff's Exhibit 12" while effectively asking the Court to disregard that exhibit. [Dkt. No. 96] at 16. In addition, defendant argues that it provided plaintiff all information in its possession regarding the March 2015 incidents as part of the discovery process. Id. at 17.

## II. Discussion

### A. Legal standard

Rule 59(a)(2) provides that "[a]fter a nonjury trial, the court may, on motion for a new trial, open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(2). "The grant or denial of a motion for new trial is entrusted to the sound discretion of the district court and will be reversed on appeal only upon a showing of abuse of discretion." Cline v. Wal-Mart Stores, 144 F.3d 294, 305 (4th Cir. 1998). "This rule has been interpreted as allowing a new trial to be granted in a nonjury action only if a new trial might be obtained under similar circumstances in a jury action." Brailey v. Advance Am. Cash Advance Centers of Virginia, Inc., No. 3:08-cv-365, 2009 WL 2594729, at *1 (E.D. Va. Aug. 21, 2009) (internal quotation marks and citation omitted). Acceptable reasons include: "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Cline, 144 F.3d at 301 (internal quotation marks and citation omitted). The Fourth Circuit has held that a motion for rehearing after a bench trial "should be based upon manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." United States v. Timms, 537 F. App'x 265, 267 (4th Cir. 2013) (internal quotation marks and citation omitted). "[A] new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." Id. (internal quotation marks and citation omitted).

## B. Analysis

As an initial matter, Williams' motion seeks relief that appears to be unavailable under Rule 59(a)(2). Although that rule provides that a court may "open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment," it only expressly gives a court the authority to do so "on motion for a new trial." Fed. R. Civ. P. 59(a)(2). As a district court in North Carolina recently observed, in "the Fourth Circuit, Rule 59(a)(2) has only been addressed when a party has moved for a new trial." Driskell v. Summit Contracting Grp., Inc., 325 F. Supp. 3d 665, 679 (W.D.N.C. 2018). Williams' motion asks the Court to enter a new judgment and amend its findings of fact and conclusions of law, without asking for a new trial, and she has provided no case law suggesting that the Court has the authority to take such actions under Rule 59(a)(2) absent such a motion. Nor did she file a motion under Rule 52(b) or 59(e) to amend or alter the judgment separate and apart from a new trial. Accordingly, her motion can be denied on this procedural ground; however, the merits of plaintiff's arguments will also be addressed.

### 1. The Court's ruling on plaintiff's objection to QuTech's use of Crispin as a witness

Even if the Court had the authority under Rule 59(a)(2) to grant the relief requested, it would be denied. First, although Williams argues that under Rule 37, QuTech should not have been able to call Crispin as a witness because it failed to timely disclose his accurate address, that rule provides that a witness may nonetheless be permitted to testify in such a situation if the failure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). A district court has "broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless for purposes of a Rule 37(c)(1) exclusion analysis." Southern States Rack And Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003). In conducting this analysis, "a

district court should be guided by the following factors: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." Id. The balance of these factors weighs in favor of allowing Crispin to testify.

First, there was no surprise to Williams. Not only did defendant include Crispin in both its initial disclosures and its trial witness lists, [Dkt. Nos. 31, 47-1, 90-1], but Williams, herself, included Crispin among her list of "People with Discoverable Information" in her Rule 26(a)(1) initial disclosures, [Dkt. No. 96-1], and also listed Crispin among the "Witnesses Whom Plaintiff May Call to Testify" in her Rule 26(a)(3) disclosures. [Dkt. No. 32]. Like defendant, Williams did not provide Crispin's address. [Dkt. No. 96-1] at 2; [Dkt. No. 32] at 2. She was therefore well aware, from the beginning of discovery, that Crispin might be a witness.

Moreover, QuTech's explanation for not having a current address for this former employee was a reasonable one. In addition, although QuTech's counsel made an inaccurate statement at trial when he suggested that QuTech had served Crispin at his correct address "45 days or so ago," this error was immaterial, as Williams did get notice of Crispin's address three weeks before trial. During this period, she could have, but did not, file a motion to reopen the discovery period to depose Crispin before trial or file a motion to quash QuTech's subpoena of him to testify at trial. That she chose to take none of these actions, and instead raised her concern for the first time at trial, suggests that any surprise she experienced by Crispin's trial testimony was of her own making.

Allowing Crispin to testify did not disrupt trial. In fact, conducting a trial without Crispin would likely have been deficient because he was a critical witness, as he was the person who

ultimately decided to recommend terminating Williams. Had he not testified, the Court would have been denied the opportunity to evaluate his credibility and adequately assess whether defendant's proffered reasons for the termination were pretextual. Accordingly, the balance of the Southern States factors weighs in favor of allowing Crispin to testify. Because plaintiff's claim that allowing him to testify "resulted in a miscarriage of justice" is without merit, his testimony will not be struck from the record.

## 2. The Court's discussion of Plaintiff's Exhibit 12

Williams has identified no reason why the Court should amend its judgment based on its consideration of the various incidents of prior misconduct referenced in Exhibit 12. It was Plaintiff's counsel who introduced Exhibit 12, and as defendant observed, Williams "cites no case law permitting a party to strike its own exhibit because the exhibit had the opposite of its intended effect." [Dkt. No. 96] at 12. Williams' counsel had ample opportunity during trial to address the incidents of prior misconduct referenced in Exhibit 12, but opted not to do so. Moreover, although Williams suggests the Court should have considered Renee Parker's affidavit stating that the March 2015 incident could not be corroborated, Williams did not introduce this affidavit into evidence at trial.[15] At bottom, Williams asks the Court to ignore an exhibit that she herself introduced, and instead rely on information that was not part of the trial record. Such a request has no merit.

Moreover, Crispin referenced prior incidents of insubordination during his trial testimony, see, e.g., Trial Tr. at 76:20-23, indicating that he genuinely believed such incidents

---

[15] Although Williams initially sought to subpoena Parker to testify at trial, she did so only six days before trial without obtaining a court order authorizing an untimely subpoena, in violation of Local Rule 45(e). Defendant filed a motion to quash, [Dkt. No. 76], and rather than opposing the motion, Williams withdrew the subpoena, [Dkt. No. 78].

had occurred, even though he could not recall the specific dates offhand. "[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks and citation omitted). As the Fourth Circuit has observed in the analogous Title VII context, if a plaintiff "was fired for misconduct she did not actually engage in, that is unfortunate, but a good-faith factual mistake is not the stuff of which Title VII violations are made." Villa v. CavaMezze Grill, LLC, 858 F.3d 896, 903 (4th Cir. 2017).[16] In cases like this, "the facts the decision-maker actually perceived" matter. Villa, 858 F. 3d at 901.

In addition, neither the Court's judgment nor Crispin's proffered reasons for recommending terminating Williams rested on Exhibit 12 alone. Even if plaintiff had not introduced Exhibit 12, the Court's judgment would have been the same. The evidence at trial demonstrated that Crispin, whom the Court found to be the more credible witness, believed that Williams had behaved defiantly and insubordinately during two meetings, stormed out of those meetings without explanation after being asked to stay, disrupted the office, appeared to leave the premises with her belongings before the end of her shift, and intimidated other managers. See United States v. Hall, 664 F.3d 456, 462 (4th Cir. 2012) ("When findings are based on determinations regarding the credibility of witnesses," the Court of Appeals gives "even greater deference to the trial court's findings," because "only the trial judge can be aware of the

---

[16] "While evidence of an obviously inadequate investigation into the employee's misconduct could tend to show that claimed employee misconduct was actually a pretext for prohibited animus," id. at 905, Williams presented no such evidence.

variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.") (quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 575 (1985)). The Court concluded that these reasons, which were consistent with the substance of Exhibit 12, genuinely motivated Crispin's decision to recommend terminating Williams, and that his decision was not motivated by a desire to retaliate against plaintiff for seeking an ADA accommodation. An employer "has no obligation under the ADA to overlook or accommodate rude behavior or insubordination," Karoue v. Blue Cross Blue Shield of S.C., No. 3:13-cv-1844, 2014 WL 5810321, at *10 (D.S.C. Nov. 7, 2014),[17] and Crispin's testimony made clear that he believed Williams' behavior was rude and insubordinate. See also Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008) ("[A] complaining worker is not thereby insulated from the consequences of insubordination."). Ultimately, the burden at trial was on Williams to establish that the reasons provided for her termination were pretextual, and she failed to do so. The Court therefore concluded that it was appropriate to rule in QuTech's favor.

### 3. The Court's assignment of credibility to Crispin's testimony

Finally, Williams has presented no compelling reason to revisit findings as to Crispin's credibility. Williams argues that Crispin was not credible because his testimony conflicted with hers, particularly with respect to whether the phone calls during the September 18 meetings took place over Crispin's cell phone or over QuTech's phone technology. Contrary to Williams'

---

[17] The Court is of course cognizant that, as other circuits have held, an employer "cannot invoke the specter of insubordination in order to mask [] retaliation for requesting [an] accommodation,'" Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 118 (1st Cir. 2013) (internal quotation marks and citation omitted), or rely on "a disingenuous overreaction to justify dismissal of an annoying employee who asserted [her] rights under the ADA." Miller v. Ill. Dep't of Transp., 643 F.3d 190, 200 (7th Cir. 2011), or terminate an employee because it is "tired of her persistent requests for an accommodation." Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 190 (3d Cir. 2003). The evidence at trial did not establish that Crispin recommended terminating Williams, in whole or in part, for any of these reasons.

assertion, the mere fact that Williams and Crispin reported this event differently does not mean that Crispin's testimony was necessarily "erroneous." [Dkt. No. 90] at 7. If plaintiff's counsel wanted to challenge Crispin's credibility, he could have specifically asked Crispin about the cell phone issue during cross-examination, but he chose not to do so. Based on Williams' and Crispin's testimonies and demeanors at trial, the Court found Crispin a more credible witness. Plaintiff has given the Court no reason to revisit this conclusion.

### III. Conclusion

In sum, plaintiff has failed to show that the judgment was based on a manifest error of law or mistake of fact, or otherwise provide any justification for revisiting the judgment. As the Fourth Circuit has held, "a judgment should not be set aside except for substantial reasons." Timms, 537 F. App'x at 267. Because, as explained above, none are present here, plaintiff's Motion for Further Action After a Non-Jury Trial [Dkt. No. 89] will be denied by an Order to be issued with this Memorandum Opinion.

Entered this 18th day of February, 2020.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge